**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------- x

UNITED STATES OF AMERICA,

       Plaintiff,

STRUCTURAL STEEL AND BRIDGE PAINTERS OF GREATER NEW YORK, LOCAL UNION No. 806, EFROSINI KATANAKIS, LUZIA OLISKOVICZ, JOANN RUSH and HELEN JACKSON,

       Plaintiff–Intervenors,

  - v. -

CITY OF NEW YORK and NEW YORK CITY DEPARTMENT OF TRANSPORTATION,

       Defendants.

------------------------------------------------------------------- x

ECF Case

07 Civ. 2083 (WHP)(HP)


**PRE-TRIAL MEMORANDUM OF PLAINTIFF THE UNITED STATES**

PREET BHARARA
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2725/2734
Facsimile: (212) 637-2686
Email: Jeannette.vargas@usdoj.gov
       Allison.d.penn@usdoj.gov
       Li.yu@usdoj.gov

JEANNETTE A. VARGAS
ALLISON D. PENN
LI YU
Assistant United States Attorneys
   – Of Counsel –

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

SUMMARY OF EVIDENCE .................................................................................................... 2

    I.    DEFENDANTS CONSISTENTLY TREATED MALE APPLICANTS MORE FAVORABLY THAN THE FEMALE BRIDGE PAINTERS WHO APPLIED ............................................................. 2

    II.    DEFENDANTS' SHIFTING AND CONTRADICTORY EXPLANATIONS FOR THEIR FAILURE TO HIRE ANY OF THE FEMALE BRIDGE PAINTERS ............................................................. 4

    III.    THE PROVISIONAL HIRING PROCESS WAS STANDARDLESS, SUBJECTIVE, AND *AD HOC* ............................................................................................................................ 5

    IV.    DEFENDANTS' ACTUAL MOTIVES FOR REFUSING TO HIRE FEMALE BRIDGE PAINTERS .... 6

ARGUMENT ........................................................................................................................ 7

    I.    THE APPLICABLE LEGAL STANDARDS .................................................................... 7

        A.  The United States Is Entitled to Judgment on Liability By Showing, By a Preponderance of the Evidence, That Defendants Engaged in Pattern or Practice of Gender Discrimination in Hiring for the Provisional Bridge Painter Position ............. 7

        B.  Defendants' Discriminatory Motive Can Be Inferred from Their Pretextual Justifications and Circumstantial Evidence of Discrimination ................................... 7

    II.    THE EVIDENCE WILL ESTABLISH THAT DEFENDANTS ENGAGED IN A PATTERN OR PRACTICE OF GENDER DISCRIMINATION IN HIRING PROVISIONALLY FOR THE BRIDGE PAINTER POSITION ................................................................................................... 8

        A.  Defendants' Records and Testimony of Their Employees Will Demonstrate That Each Female Bridge Painter Was Subjected to Disparate Treatment Vis-à-Vis Male Applicants ..................................................................................................................... 8

        B.  Direct and Circumstantial Evidence Will Establish Defendants' Unlawful Discriminatory Motive .................................................................................................. 9

        C.  The Evidence at Trial Will Show Provisional Hiring for the Bridge Painter Position Was "Subjective and *Ad Hoc*" ...................................................................................... 11

        D.  The Evidence at TriaWill Show That Defendants Were Engaged in a Pattern of Gender Discrimination .................................................................................................. 12

CONCLUSION ..................................................................................................................... 13

## TABLE OF AUTHORITIES

**CASES**                                                                                                                                                          **PAGE**

*Bazemore v. Friday*, 478 U.S. 385 (1986) .................................................................................. 8

*E.E.O.C. v. Am. Nat'l Bank*, 652 F.2d 1176 (4th Cir. 1981) ........................................................ 1

*E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263 (11th Cir. 2000) ............................................. 8

*E.E.O.C. v. L. A. Weight Loss,* 509 F. Supp. 2d 527 (D. Md. 2007) ............................................ 9

*E.E.O.C. v. O&G Spring and Wire Forms Specialty Co.,* 38 F.3d 872 (7th Cir. 1994) ................ 8

*Emmel v. Coca-Cola Bottling Co. of Chicago, Inc.*, 904 F. Supp. 723 (N.D. Ill. 1995) .............. 10

*Grant v. Hazelett Strip-Casting Corp.,* 880 F.2d 1564 (2d Cir. 1988) .......................................... 8

*Gregory v. Daly*, 243 F.3d 687 (2d Cir. 2001) ............................................................................. 8

*Holcomb v. Iona College*, 521 F.3d 130 (2d Cir. 2008) ............................................................... 8

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977) .................................................... 1

*Lewis v. City of Chicago*, 496 F.3d 645 (7th Cir. 2007) ......................................................... 8, 10

*Luciano v. Olsten Corp.*, 110 F.3d 210 (2d Cir. 1997) ................................................................. 8

*Pitre v. Wester Elec. Co., Inc.*, 843 F.2d 1262 (10th Cir. 1988) ................................................. 11

*Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133 (2000) .............................................. 10

*Residential Funding Corp. v. DeGeorge Financial Corp.*,
  306 F.3d 99 (2d Cir. 2002) ...................................................................................................... 11

*Robinson v. Metro-North Commuter R.R.,* 267 F.3d 147 (2d Cir. 2001) ..................................... 7

*Rose v. New York City Bd. of Educ.*, 257 F.3d 156 (2d Cir. 2001) .............................................. 8

*Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991) ............................................................. 8

*Wright v. Stern*, 450 F. Supp. 2d 335 (S.D.N.Y. 2006) .............................................................. 11

*Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212 (S.D.N.Y. 2003) ........................................... 11

**PRELIMINARY STATEMENT**

No woman has ever been appointed as a bridge painter at the in-house bridge painting section (the "BP Section") of New York City Department of Transportation ("DOT"), although four experienced female bridge painters applied between 1997 and 2002. The "ultimate issue" in this case is whether this glaring absence results from defendants' "regularly and purposefully treat[ing]" female bridge painters "less favorably than [men]" on account of gender. *E.E.O.C. v. Am. Nat'l Bank*, 65 F.2d 1176, 1188 (4th Cir. 1981). The answer, as the trial will show, is yes.

At trial, the evidence will unequivocally establish that DOT made job offers to, and indeed hired, male applicants who were significantly less qualified than the female bridge painters. The trial also will establish that, in 2000, DOT officials admitted to basing their hiring decisions on gender – they told representatives of bridge painters' union local that DOT chose not to interview or appoint female bridge painters because there were "no facilities" for them to change clothes.

Beyond direct evidence of intent, significant circumstantial evidence also shows that defendants purposefully chose not to hire female bridge painters on account of gender. This can be discerned from a clear pattern of less favorable treatment of female applicants vis-à-vis the men who applied. The Court also can infer defendants' unlawful motive from their shifting and contradictory explanations for not interviewing or picking women. Lastly, the internal dynamics of the BP Section – that some male bridge painters were resistant to working with women – further reveal the purposeful nature of defendants' disparate treatment of female bridge painters. Indeed, acting director of the BP Section characterized the bridge painters working as "like a fraternity."

Finally, defendants' unequal treatment of female bridge painters was not "isolated" or "random"; instead, it was pervasive, *i.e.*, affecting each female applicant, and persistent, *i.e.*, enduring through three hiring cycles. Gender-based disparate treatment, in short, was the "standard operating procedure" when defendants went about hiring bridge painters. *See Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977).

## SUMMARY OF EVIDENCE

**I.    Defendants Consistently Treated Male Applicants More Favorably Than the Female Bridge Painters Who Applied**

At trial, the testimony of Joann Rush, Helen Jackson, Luzia Oliskovicz, and Efrosini Katanakis, the four female bridge painters who applied to work at DOT, will demonstrate that each had sufficient training and work experience for the position sought.  Defendants' own records and witnesses, moreover, will make plain that all of these female bridge painters received less favorable treatment than men who applied to become bridge painters at DOT.

Joann Rush first applied to work at DOT in the 1997/1998 hiring cycle.  *See* Proposed Stipulation No. 6.  At that time, she had completed the standard, three-year apprentice training and had worked for more than a decade as an apprentice and then a journeywoman bridge painter.  Defendants did not interview Ms. Rush, purportedly because she had an outdated phone number.  *See id*. No. 26; *see also* EEOC Position Statement, dated May 29, 2002, U.S. Ex. 19.  Defendants, however, managed to interview male applicants who similarly had submitted applications with incorrect or missing phone numbers.  Christopher Serino, for example, submitted a resume with an outdated telephone number.  *See* Serino Resume, U.S. Ex. 3 at 276.  Defendants nonetheless interviewed him and recommended him for appointment as a provisional bridge painter.  *See* Proposed Stipulation No. 9.

When Helen Jackson applied to work at DOT as a bridge painter in 1998 and again in 1999, she had worked for at least five years painting bridges and also had completed the apprentice training program.  Defendants did not give Ms. Jackson an interview in either hiring cycle, *see* Proposed Stipulation No. 27, purportedly because she lacked sufficient work experience, *see* May 29, 2002 EEOC Position Statement.  Men who did not complete the apprenticeship training and with significantly less experience, however, were interviewed and even selected for hiring.  In 1999, for example, defendants interviewed Frank Mota.  Mr. Mota's resume shows that he had not

2

worked as a bridge painter for 15 years prior to applying to DOT, did not complete a bridge painter apprentice training program, and worked as a painter for, at most, three years. *See* Mota Resume, U.S. Ex. 11 at 293. In 1998, defendants interviewed Mr. Serino, even though his full-time work experience as a bridge painter fell well short of five years. *See* Serino Resume, U.S. Ex. 3 at 276-79.

Defendants similarly subjected Luzia Oliskovicz to disparate treatment vis-à-vis male applicants in 1999. When she was interviewed by DOT, Ms. Oliskovicz had completed the apprentice training program and had consistently worked painting bridges for 11 years. Indeed, as defendants acknowledge, she met the five-year experience requirement for the bridge painter position at DOT. *See* Proposed Stipulation No. 29. But Ms. Oliskovicz was not offered a provisional appointment as a bridge painter at DOT, *see id*. No. 30; instead, defendants hired two men, Brian Casey and Frank Duic, *see id*. No. 16. As of 1999, Mr. Duic, who graduated from high school in 1995, had worked as a full-time bridge painter for much less than five years. He, unlike Ms. Oliskovicz, did not complete a bridge painter apprentice training program.

Finally, as a DOT EEO observer, Michelle Vulcan, will testify at trial, defendants picked three male applicants for hiring over Efrosini Katanakis in the 2001 cycle. One or more of these men benefitted from more favorable treatment than Ms. Katanakis. Specifically, when Ms. Katanakis tried to clarify the questions asked during her interview, DOT officials perceived her action in gender-stereotypical terms, surmising that she was "trying to come on to" Leonid Levit, the then-director of the BP Section. On the other hand, as Ms. Vulcan will testify, when Diamanteo Lima, the male applicant who was interviewed right after Ms. Katanakis and ultimately was picked for hiring, struggled with a questions, Mr. Levit "gave [him] a clue." *See* Vulcan Deposition Transcript at 61:9-15.

## II. Defendants' Shifting and Contradictory Explanations for Their Failure to Hire Any of the Female Bridge Painters

Defendants have offered inconsistent reasons for why the four female bridge painters were not interviewed or selected to be hired. At trial, the testimony of Ms. Rush, two officials of the local union organization for bridge painters – Joseph Ramaglia and Angelo Serse, and DOT officials Michael Tohl, Earlene Powell, Paul Kahn, Leonid Levit, Joseph Lamberson, and Michele Vulcan will illustrate this pattern of shifting explanations.

Defendants have offered three divergent explanations for why they did not interview Ms. Rush in the 1997/1998 hiring cycle. First, in a series of meetings in 2000, as Mr. Ramaglia and Mr. Serse will testify, Mr. Levit and Ms. Powell attributed DOT's failure to hire Ms. Rush and the other female bridge painters to a shortage of changing facilities for women. Second, as Ms. Rush will testify, Ms. Powell provided her with a different reason in a telephone conversation —that Ms. Rush was not interviewed because she did not possess a commercial driver license. Finally, defendants settled on their current explanation, that Ms. Rush had an outdated telephone number on her resume, only after the filing of an EEOC complaint alleging a pattern or practice of gender discrimination. *See* May 29, 2002 EEOC Position Statement.

Defendants' explanation as to why Ms. Jackson was never interviewed also shifted over time, including during litigation. After first attributing the failure to interview Ms. Jackson to a lack of changing facilities for women, defendants next blamed it on Ms. Jackson's lack of work experience. *See* May 29, 2002 EEOC Position Statement. However, as the testimony of Mr. Tohl, Ms. Powell, Mr. Kahn and Mr. Levit will show, no DOT official will take responsibility for choosing not to interview Ms. Jackson; instead, each, in his or her deposition testimony, tried to shift the blame.

With respect to Ms. Oliskovicz, defendants now assert that they did not hire her due to budget cuts and Mr. Duic's superior interview performance, assertions that are at odds with the

4

explanation that Mr. Levit and Ms. Powell gave in 2000, citing a lack of changing facilities. Even this belated explanation is undercut by Joseph Lamberson, DOT's 30(b)(6) representative on personnel policies. Mr. Lamberson testified in deposition that there is no basis to Mr. Levit's claim that Mr. Levit was required to consider only interview performance in selecting applicants, to the exclusion of experience. *See* Lamberson Deposition Transcript at 112:5–113:5.

Finally, while defendants attribute their failure to appoint Ms. Katanakis in the 2001 hiring cycle to budget cuts, they offer no credible explanation for not selecting her as one of the three applicants recommended for appointment. Indeed, based on their deposition testimony, it appears that DOT officials will give directly conflicting accounts at trial about how these selections were made. The EEO observer, Ms. Vulcan, will testify that the selections were made based on discussions among Mr. Levit, Ms. Powell and Vincent Babajko and Jure Dzida, two supervising bridge painters. Ms. Powell, Mr. Babajko, and Mr. Dzida, however, will deny having participated in the selection. Moreover, whereas Mr. Levit, who claims not to recall whether Ms. Katanakis had been passed over in favor of male applicants, maintains that he had given Ms. Powell notes on the ranking of the applicants, Ms. Powell will deny ever having received from Mr. Levit these notes, which defendants lost following the filing of an EEOC complaint alleging gender discrimination.

## III.    The Provisional Hiring Process Was Standardless, Subjective, and *Ad Hoc*

Nearly every facet of provisional hiring for the bridge painter position at DOT was standardless, subjective and *ad hoc*. A lack of standards, and the failure to enforce the few requirements that existed, characterized the announcements for vacancies for the bridge painter position. As the Court noted, defendants' vacancy notices consistently misstated the prerequisites for applying for the position – purporting to require applicants to possess a Class B commercial driver license when, in fact, a candidate had a one-year grace period to obtain such a license. *See*

5

Memorandum and Order, dated July 1, 2009 ("SJ Decision") at 10.  Further, although all the vacancy notices purport to limit eligibility to candidates already working for DOT or the City of New York, such requirements never were enforced.  *See* Lamberson Dep. Tr. at 127:20–132:18.

Defendants' review and screening of resumes and applications were likewise arbitrary.  Although the job description for the bridge painter position required five years of full-time work experience painting bridges, defendants interviewed numerous male applicants, such as Mr. Mota and Mr. Duic, with significantly less work experience.  *See supra* at 2-3.  Indeed, as DOT officials have already testified, under-qualified male applicants routinely were able to "slip[] through" and get interviews or job offers.  *See* Tohl Deposition Transcript at 193:5-10.

## IV. Defendants' Actual Motives for Refusing to Hire Female Bridge Painters

The highly subjective provisional hiring process gave defendants broad latitude to deny interviews and job opportunities to female bridge painters.  By only hiring men, DOT officials avoided the inconvenience of having to procure changing facilities for women and confronting resistance to the inclusion of women on the part of certain male bridge painters.

First, as noted above, Mr. Levit and Ms. Powell told union representatives in 2000 that DOT did not appoint the first three female bridge painters who had applied because there were "no facilities" for women.  As DOT officials' testimony will show, Mr. Levit and Ms. Powell were correct that, at that juncture, the BP Section had no changing facility designated for female bridge painters.  Specifically, a new DOT facility being built near the 59th Street Bridge would not have become available until 2002 or 2003.  Furthermore, while the BP Section had trailers at its facility at Greenpoint in Brooklyn, all the trailers had been assigned to crews of male bridge painters.  Allocating one or more the trailers to female bridge painters, as Mr. Dzida or Mr. Babajko will explain, would have come at the expense of a crew of male bridge painters.

Second, by passing over the female bridge painters, and only selecting male applicants to hire, DOT officials did not have to confront resistance to the inclusion of women within the BP Section. As Ms. Powell's testimony about the resistance she experienced from the rank-and-file will show, certain male bridge painters working at the BP Section opposed any change, such as having to report to a female supervisor, to the *status quo* — an all-male group that was, according to Mr. Tohl, "like a fraternity." Tohl Deposition Transcript at 52:3-16.

**ARGUMENT**

I. **Applicable Legal Standards**

    A. <u>The United States Is Entitled to Judgment on Liability By Showing, By a Preponderance of the Evidence, That Defendants Engaged in Pattern or Practice of Gender Discrimination in Hiring for the Provisional Bridge Painter Position</u>

To prevail, the United States has the burden to "demonstrate[] a pattern or practice of discrimination by a preponderance of the evidence." *EEOC v. O&G Spring and Wire Forms Specialty Co.*, 38 F.3d 872, 878 (7th Cir. 1994) (quoting *Bazemore v. Friday*, 478 U.S. 385, 398 (1986)). Because a pattern or practice claim "focus[es] on … widespread acts of intentional discrimination," it requires a showing that defendants' disparate treatment of female bridge painters were not "sporadic acts of discrimination," but instead was their "standard operating procedure." SJ Decision at 8 (quoting *Robinson v. Metro-North Commuter R. R. Co.*, 267 F.3d 147, 158 (2d Cir. 2001)). As the Court held in denying defendants' summary judgment motion, proof of a pattern or practice of discrimination claim can consist of evidence relating to specific instances of discrimination and evidence of patterns, policies and practices. *See id.* at 9.

    B. <u>Defendants' Discriminatory Motive Can Be Inferred from Their Pretextual Justifications and Circumstantial Evidence of Discrimination</u>

To conclude that defendants' persistent refusal to hire female bridge painters resulted from a discriminatory intent, the Court can rely on either direct or circumstantial evidence of such an unlawful motive. *See Gregory v. Daly*, 243 F.3d 687, 695 (2d Cir. 2001). A "statement[] by [an]

7

employer that it explicitly took age or sex into account in making an employment decision" constitutes direct evidence of discriminatory intent, *Grant v. Hazelett Strip-Casting Corp.*, 880 F.2d 1564, 1568 (2d Cir. 1988), and is sufficient, in itself, to support a finding of employment decisions were "motivated, at least in part, by a forbidden factor." *See Rose v. NY City Bd. of Educ.*, 257 F.3d 156, 162 (2d Cir. 2001). Moreover, "direct evidence of an intent to discriminate may be used to establish a pattern or practice claim" of discrimination. *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1287 (11th Cir. 2000) (internal quotation omitted).

In addition to direct evidence, the Court can also rely on "the cumulative weight of circumstantial evidence" to establish an unlawful motive. *Luciano v. Olsten Corp.*, 110 F.3d 210, 215 (2d Cir. 1997); *see also Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008) (circumstantial evidence important because "direct evidence of [discriminatory] intent will only rarely be available"); *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991) (employers "who discriminate[] [are] unlikely to leave [] 'smoking gun[s]' … attesting to a discriminatory intent"). In that regard, evidence of a pattern of "systematically better treatment" of male applicants compared to female bridge painters, proof of discriminatory "behavior [] or comments directed at other employees," or pretextual explanations for the employment decisions at issue each can support a finding of discriminatory intent. *Lewis v. City of Chicago*, 496 F.3d 645, 652 (7th Cir. 2007).

II. **The Evidence Will Establish That Defendants Engaged in a Pattern or Practice of Gender Discrimination in Hiring Provisionally for the Bridge Painter Position**

   A. <u>Defendants' Records and Testimony of Their Employees Will Demonstrate That Each Female Bridge Painter Was Subjected to Disparate Treatment Vis-à-Vis Male Applicants</u>

As the Court held, the existence of a pattern or practice of gender discrimination in hiring can be proved through specific instances of disparate treatment of female applicants vis-à-vis men

8

who applied.  *See* SJ Decision at 9.  The trial will show unmistakably that all four female bridge painters were treated differently from, and less favorably than, one or more male applicants.

Briefly, Joann Rush, an experienced bridge painter when she applied in the 1997/1998 hiring cycle, did not get interviewed even though less qualified men with similarly out-of-date contact information, such as Christopher Serino, were interviewed and offered appointments.  *See supra* at 2.  Defendants likewise denied Helen Jackson the opportunity to interview in both 1998 and 1999, while simultaneously giving interviews to unqualified male applicants, such as Mr. Serino in the 1997/1998 hiring cycle and Frank Mota and Frank Duic in the 1999 hiring cycle.  *See supra* at 2-3.  Luzia Oliskovicz, whom defendants interviewed in 1999, was passed over in favor of a clearly unqualified man, Mr. Duic.  *See supra* at 3.  Finally, in 2001, DOT officials selected three men, and not Efrosini Katanakis, to recommend for hiring, including Diamanteo Lima, who was interviewed immediately after Mr. Katanakis and was given help with getting the right answers – help that Ms. Katanakis did not receive.  *See supra* at 3.

These instances of disparate treatment, together, evince a clear pattern — *each* female bridge painter was subjected to less favorable treatment than male applicants *each* time that she applied.  They are, therefore, highly probative of a *de facto* policy of gender discrimination.  *See EEOC v. L.A. Weight Loss*, 509 F. Supp. 2d 527, 533 (D. Md. 2007) (a pattern or practice of discrimination can be established through "a cumulation of evidence including [] patterns, practices … or specific instances of discrimination") (internal quotation omitted).

    B.    <u>Direct and Circumstantial Evidence Will Establish Defendants' Unlawful Discriminatory Motive</u>

The Court has ample basis for concluding that the consistently unfavorable treatment of female bridge painters was purposeful and gender-based.  First, the anticipated testimony of Joseph Ramaglia, Angelo Serse, Leon Levit and Earlene Powell will provide direct evidence that defendants refused to interview or hire female bridge painters on account of their gender.

9

Specifically, in two meetings in 2000 – one at DOT's offices and the second at Moran's Steakhouse – Ms. Powell and then Mr. Levit stated that DOT had not hired any woman because there were "no facilities" for female bridge painters to change.  These admissions, which will be corroborated by other testimony at trial, conclusively establish both that the unlawful motive was behind defendants' specific hiring decisions and, more broadly, a policy of gender discrimination. *See Joe's Stone Crab*, 220 F.3d at 1287.

In addition, there will be ample circumstantial evidence adduced at trial establishing that defendants did not hire the single female bridge painter on account of gender.  First, at trial, the anticipated testimony of other DOT officials and defendants' own records will highlight a pattern of male and female applicants receiving unequal treatment — unqualified men seeking provisional appointments as bridge painters, as Mr. Tohl acknowledged in deposition, routinely "slipped through" to get interviews and job offers, *see* Tohl Deposition Transcript at 193:5-10; yet, the four female bridge painters repeatedly were denied opportunities to interview or selection.  Such a record of "systematically" differential treatment based on gender is sufficient for inferring an unlawful, discriminatory motive.  *See Lewis v. City of Chicago*, 496 F.3d at 652; *Emmel v. Coca-Cola Bottling Co. of Chicago*, 904 F. Supp. 723, 739 (N.D. Ill. 1995) (upholding jury verdict finding liability in Title VII case).

Second, defendants' ever shifting and self-contradictory reasons for their failure to appoint any of the female bridge painters also permit the Court to infer the requisite discriminatory motive. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 146 (2000).  For example, although defendants claim that Helen Jackson was not interviewed in 1998 or 1999 on account of her work experience, trial testimony will show that no DOT official apparently will admit to making the decision not to interview her.  *See supra* at 4.  Likewise, DOT officials have given at least three

varying rationales for not interviewing Joann Rush. *Id.* Indeed, the only constant in these various and varying explanations seems to be their internal inconsistency.

Finally, defendants' failure to preserve Mr. Levit's notes from the 2001 interviews also is strongly indicative of discriminatory intent. At trial, the testimony of DOT officials will establish that Mr. Levit's notes included a ranking of the interviewees based on their answers and remained in his possession after he became aware of the female bridge painters' EEOC complaint. Defendants have failed to produce those notes — Mr. Levit claims that he gave them to Ms. Powell, but Ms. Powell denies this. Because those notes are highly relevant evidence,[1] because they were lost or destroyed when defendants had a clear duty to preserve them, *i.e.*, after the filing of EEOC charges, *see Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003), and because, as trial testimony will show, the failure to preserve those notes was, at a minimum, negligent, there is ample basis to infer that those notes would have made clear that gender discrimination caused DOT's selection of three men over Ms. Katanakis. *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107-08 (2d Cir. 2002).

      C.    <u>The Evidence at Trial Will Show That Provisional Hiring for the Bridge Painter Position Was "Subjective and *Ad Hoc*"</u>

It is well-settled that an employer's reliance on subjective employment practices tends to "permit discrimination to flourish." *Wright v. Stern*, 450 F. Supp. 2d 335, 365 (S.D.N.Y. 2006); *see also Pitre v. Western Elec. Co.*, 843 F.2d 1262, 1271 (10th Cir. 1988) (subjective employment practices tends to "reinforce the prejudices, unconscious or not, which Congress in Title VII sought to eradicate") (internal quotation omitted). At trial, the evidence will make plain that the provisional hiring process for appointing bridge painters was standardless, subjective, and *ad hoc* at every step in the process — beginning from the content of the vacancy notices and ending with

---

[1] Mr. Vulcan's anticipated testimony will show that Mr. Levit helped a male applicant, Diamanteo Lima, who was interviewed immediately after Efrosini Katanakis and was selected over her.

the way that interviewees were evaluated.  *See supra* at 4.  Proof of defendants' "subjective and *ad hoc*" hiring practices "bolster[s]" the conclusion that they engaged in a pattern or practice of gender discrimination.  *See* SJ Decision at 10 (internal quotation omitted).

### D. The Evidence at Trial Will Prove That Defendants Were Engaged in a Pattern of Gender Discrimination

At trial, it will become plain that the glaring absence of women from the ranks of bridge painters at DOT is not the result of random and sporadic acts of discrimination.  Instead, the totality of the evidence of defendants' practice of favoring male applicants over the female bridges painters, of an unlawful motive underlying such practice, and of a standardless and subjective hiring process, combine to prove that no female bridge painter has been appointed to the BP Section because defendants were engaged in a pattern or practice of gender discrimination.

More specifically, the evidence at trial will demonstrate that two recurring concerns related to hiring women – lack of changing facilities and resistance to women from certain male bridge painters – were at work in the instances of discrimination against the four female bridge painters.  *See supra* at 6-7.  Furthermore, defendants' unequal treatment of the female bridge painters relied on the same process, an opaque and standardless provisional hiring system.  *See supra* at 5-6.  Finally, the product of defendants' pattern or practice of gender discrimination betrays both its existence and effectiveness — disparate treatment of women was pervasive, *i.e.*, affecting each female bridge painter who applied, and persistent, *i.e.*, enduring through three hiring cycles.  Gender discrimination, put simply, was the *de facto* policy when DOT went about hiring provisional bridge painters.  *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. at 336.

## CONCLUSION

As summarized above, the evidence to be adduced at trial will establish, by a preponderance of the evidence, that defendants engaged in a pattern or practice of gender discrimination in hiring for the provisional bridge painter position at DOT.  The United States, therefore, is entitled to a judgment finding defendants liable on the Title VII pattern or practice claim.

Dated: New York, New York
       October 6, 2009

                        PREET BHARARA
                        United States Attorney

              By:  s/ Li Yu
                   JEANNETTE A. VARGAS
                   ALLISON D. PENN
                   LI  YU
                   Assistant United States Attorneys
                   Tel.: (212) 637-2678/2725/2734
                   Fax: (212) 637-2786/2686