UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,                          :

                Plaintiff,        :        07 Civ. 2083 (WHP)

    -against-                                     :        OPINION & ORDER

CITY OF NEW YORK and NEW YORK CITY       :
DEPARTMENT OF TRANSPORTATION,
                          :

            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____                  │
│ DATE FILED:  5/13/2010           │
└─────────────────────────────────┘
```

WILLIAM H. PAULEY III, District Judge:

        Plaintiff United States of America (the "Government") brings this Title VII

pattern-or-practice action against the City of New York (the "City") and the New York City

Department of Transportation (the "DOT"). The Government alleges that the Defendants

discriminate against women by hiring only men to work as City bridge painters. The evidence

adduced at trial reveals a municipal division in America's largest city that refuses to hire women,

in spite of societal norms, sound business practice, and city, state, and federal law. The Supreme

Court's observation 37 years ago that "the sex characteristic frequently bears no relation to

ability to perform or contribute to society"[1] is only underscored by actions like this one. This

Court makes the following findings of fact and conclusions of law as required under Fed. R. Civ.

P. 52(a) and determines that the United States has established its pattern-or-practice disparate

treatment claim.

---

[1] Frontiero v. Richardson, 411 U.S. 677, 686 (1973).

## FINDINGS OF FACT

I.   New York City Bridge Painters

    a.   Description & Duties

        From 1996 to 2001, DOT employed approximately 40 in-house bridge painters to care for its elevated iron and steel bridges (the "Bridge Painters"). (Trial Transcript ("Tr.") at 140, 180-82.) Bridge Painters work for the City's Division of Bridges in a unit known as the Bridge Painter Section. The Bridge Painter Section has a capital crew, which is responsible for working with private contractors to paint large structures, and an in-house crew, which maintains smaller elevated structures and cleans grafitti. (Tr. at 181, 188.)

        In addition to painting smaller iron and steel structures, Bridge Painters chip, clean, and prepare iron and steel surfaces for painting. (Government ("Gov.") Ex. 10: Bridge Painter Job Vacancy Notice ("Vacancy Notice").) Bridge Painters use hand tools on a daily basis and also work with power tools, such as wet blasters and needle guns, to remove old paint and graffiti. (Tr. at 186-87.) They construct their own rigging as well as containment structures to capture falling paint, often containing lead. (Tr. at 188-89.) Bridge Painters must know how to work within these containment structures and are expected to conduct road closures when work is being performed in areas of vehicle traffic. (Tr. at 188-89.)

        Painting bridges is a seasonal occupation because structural steel can only be painted when the outside temperature is above 35 degrees—at colder temperatures the paint cracks. (Tr. at 28-29, 496.) While painters in the private sector generally work seven to nine months each year, depending on weather conditions, DOT Bridge Painters are employed year-round. (Tr. at 485, 543-45.) DOT Bridge Painters paint outdoor structures from March until

-2-

November and then spend the winter months indoors at a Department of Environmental Protection ("DEP") plant on Staten Island. (Tr. at 502.) In addition, DOT Bridge Painters receive more desirable compensation packages than their private-sector counterparts, including health insurance, annuities, vacation days, and sick days. (Tr. at 533, 583.)

Structural Steel and Bridge Painters of Greater New York, Local Union No. 806 ("Local 806") is the collective bargaining agent for bridge painters employed by private contractors and the City. (Joint Stipulation of Facts attached as Schedule B to the Joint Pretrial Order ("Stipulated Fact") No. 1.) Local 806 runs an apprenticeship program for novice painters that allows apprentices to learn to mix paint, tie knots and use the tools of the bridge painting industry, move scaffolding, construct and work in containment structures, and use the protective suits, respirators, and other safety equipment. (Tr. at 16-17, 90-91.)

b.  Bridge Painter Hiring Procedures & Requirements

The DOT Bridge Painter position is a civil service title subject to competitive examination and City hiring regulations. (Tr. at 175.) In 1992, the City's Department of Personnel issued a notice of examination for the Bridge Painter position under Examination No. 1133, which had a closing date of January 22, 1992. (Stipulated Fact No. 2.) The last appointment from the civil service list of eligible candidates established under Examination No. 1133 occurred in 1994. (Stipulated Fact No. 3.) In 1996, the Department of Personnel merged with the City's Department of General Services to form the Department of Citywide Administrative Services (the "DCAS"). (Stipulated Fact No. 34.) Between 1996 and 2003, the DOT made five separate requests of DCAS to schedule a civil service exam to hire Bridge

Painters. (Stipulated Fact No. 35.)  However, the DCAS did not announce a Bridge Painter exam until 2004.  (Stipulated Fact No. 36.)

      i.  The Vacancy Notices

      In the interim, hiring was conducted on a provisional basis.  (Tr. at 175.)  DOT issued vacancy notices when Bridge Painter positions became available.  (Tr. at 175.)  During the relevant period, DOT issued four sets of notices—in October 1997 and February 1998 (the "1997-1998 Postings"), in July 1999 (the "1999 Posting"), in April and May 2001 (the "2001 Postings") and in June 2002 (the "2002 Posting").  (Stipulated Facts Nos. 5, 13, 21, 42.)  Since the start of provisional hiring, DOT has hired thirteen men as Bridge Painters.  (Stipulated Facts Nos. 10, 16, 18.)  DOT has not appointed a woman to that job title.  (Stipulated Fact No. 33.)

      The vacancy notices for the Bridge Painter position listed "Qualification Requirements" as "[f]ive years of full-time satisfactory experience acquired within the last ten years in painting bridges, towers, tanks, and other elevated steel structures, using rigging and scaffolding" (the "Five-Year Experience Requirement").  (Vacancy Notice.)  Additionally, the vacancy notices listed "License Requirements" as "[p]ossession of a Class B Commercial Driver License valid in the State of New York" (the "Class B License Requirement").  (Vacancy Notice).  However, in practice, applicants were required to obtain a Class B commercial driver license ("CDL") only at the start of their employment with DOT, and the majority of candidates for the position in 1998 did not have a CDL at the time they applied or were interviewed.  (Tr. at 145-46.)  Further, as of January 1999, DOT policy no longer required that an applicant "possess" a CDL; rather, the policy required the applicant acquire the license within 12 months of being

hired. (Tr. at 284-289; Defendant's ("Def.") Ex. HH: NYCDOT Memorandum re: Bridge
Painter License Requirements dated Jan. 13, 1999.)

The first vacancy notice issued in October 1997 limited the applicant pool to
current DOT employees. (Tr. at 143-44; Vacancy Notice.) In the February 1998 vacancy notice,
DOT expanded the applicant pool to all current City employees. (Tr. at 144.) Because DOT had
trouble filling available positions from this expanded pool, the Bridge Painter Section also
considered non-City employees who applied in response to the vacancy notices. (Tr. at 146-47,
721.) Michael Tohl ("Tohl"), who served as Acting Director of Bridge Painting from late 1996
to December 1998, was unaware of any limitations on the hiring of provisional employees. (Tr.
at 139-40, 175-76.) Moreover, the Bridge Painter Section employed no "formal mechanism" to
notify the public about job vacancies. (Tr. at 721-22.) As a result, the Bridge Painter Section
primarily resorted to "word-of-mouth" recruiting by Bridge Painters who informed Local 806
members of new openings. (Tr. at 147-48, 565, 721.) Tohl "rel[ied] on this fraternity" of
existing bridge painters and acknowledged that Local 806 members were "an easy way to reach
out." (Tr. at 148.) Word-of-mouth recruiting was especially effective in apprising potential
applicants of DOT's unpublished modifications to the Class B License Requirement and
expansion of the hiring pool to non-City employees. (Tr. at 285-86, 291-92.)

ii.  Applicant Screening & Interview Process

Applications and resumes received in response to the vacancy notices were
initially screened at DOT. (Tr. at 147-49.) Unqualified applications were endorsed "NQ," and
those applicants were never interviewed. (Tr. at 380-81.) Qualified applicants were contacted
for an interview by DOT employee Earlene Powell ("Powell"), a clerical assistant in 1998 who

-5-

was promoted to Deputy Director of Bridge Painting in late 1999. (Tr. at 371, 396-400, 411; Stipulated Fact. No. 20.)

Interviews were conducted in connection with the 1997-1998, the 1999, and the 2001 Postings. However, no interviews were conducted following the 2002 Posting. (Stipulated Facts Nos. 7, 15, 23, 44.) For the 1997-1998 Postings, the interview panel consisted of Acting Director of Bridge Painting Tohl and two supervising Bridge Painters Vincent Babajko ("Babajko") and Ed Obara ("Obara"). (Stipulated Fact No. 12.) A liaison to DOT's Equal Employment Opportunity ("EEO") office was also present at each interview. (Stipulated Fact. No. 12.) For both the 1999 and 2001 Postings, the interview panel consisted of Leonid Levit ("Levit"), the new Director of Bridge Painting as of December 1998, various Bridge Painting Supervisors, and an EEO representative. (Stipulated Facts Nos. 15, 19, 23; Tr. 294, 420.) While not a panel member, Powell was also present at the interviews for the 1999 and 2001 Postings. (Stipulated Facts Nos. 15, 23.)

## II.   Female Applicants for the Provisional Bridge Painter Position

This Court permitted Local 806 and individual Plaintiffs Joann Rush ("Rush"), Helen Jackson ("Jackson"), Luzia Oliskovicz ("Oliskovicz"), and Efrosini Katanakis ("Katanakis") to intervene in this action (collectively "Plaintiff-Intervenors"). Leave to intervene was granted after the Equal Employment Opportunity Commission ("EEOC") engaged in a soporific five-year investigation with little regard for the passage of time and the aging

-6-

process.[2] On July 7, 2009, this Court granted summary judgment to the City on all Plaintiff-Intervenors' claims but denied the motion with respect to the claim by the United States. See United States v. City of New York, 631 F. Supp. 2d 419 (S.D.N.Y. 2009).

a. Joann Rush

At the time of her DOT application, Rush had worked for more than a decade as an apprentice and journeyman bridge painter. (Tr. at 32.) From 1984 to 1986, she was an apprentice bridge painter for Belt Paint and Canopy Company on a Long Island Railroad ("LIRR") project. (Tr. at 5-6, 9; Gov. Ex 18A: Cover Letter of Joann Rush dated Aug. 8, 2001.) One of Rush's primary tasks was to operate the sandblasters—or "run the hoppers"—and load twelve 100-pound bags of sand into machines every fifteen minutes. (Tr. at 6-7.) In addition to sandblasting, Rush repaired sandblasters, mixed paint, removed paint with both hand tools and power tools, and assisted in lead containment. (Tr. at 7-9.)

After the LIRR project, Rush worked for approximately two years as an apprentice on the Kosciuszko Bridge connecting Queens and Brooklyn. (Tr. at 10, 14.) Rush continued to perform blasting and also ran the blasting crew of six to eight men. (Tr. at 12.) Additionally, she helped the crew set up the cables—known as rigging—that support bridge painters working at heights and placed scaffolding on cables. (Tr. at 11.) She also performed lead containment and paint removal by chipping, wire brushing, and needle gunning. (Tr. at 13.)

From 1988 to 1996, Rush continued work as a bridge painter with R.J. Ramano Painting ("Ramano") of Flushing, New York. (Tr. at 17, 22-23; Gov. Ex. 8: Resume of Joann

---

[2] On March 6, 2002, Oliskovicz filed a charge of discrimination with the EEOC. Rush, Katanakis, Jackson, and the Union filed EEOC charges on March 20, March 28, March 29, and April 8, 2002, respectively.

Rush undated ("First Rush Resume") at Bates No. 00404; Gov. Ex. 18A: Resume of Joann Rush
dated Aug. 9, 2001 ("Second Rush Resume") at Bates No. 00350.) Her first assignment with
Ramano was on the Brooklyn Bridge and included painting the bridge's towers. (Tr. at 18.)

        While working on the Brooklyn Bridge, Rush applied for the Local 806
apprenticeship program and was accepted after completing an aptitude test. (Tr. at 14-15.) Once
accepted, Rush completed a "crane climb," which requires climbing a one hundred foot tall crane
while carrying paint supplies, painting an area at that height, and then safely descending to the
ground. (Tr. at 15-16.) Rush passed the crane climb test. (Tr. at 16.) She then completed
approximately four years of training in the Local 806 program while continuing to work as a
bridge painter for Ramano. (Tr. at 16-18.)

        After graduating, Rush worked on a Long Island Expressway (the "LIE") project.
(Tr. at 20.) Rush was primarily a painter on the LIE project, working on scaffolds at heights,
although she also blasted and set up rigging and containment. (Tr. at 24-26.) After three to four
years on the LIE project, Rush took short term jobs with George Campbell Company on the
George Washington Bridge, worked on elevated steel structures for the J-Line Subway, and
painted outdoor and indoor structures for L&L Painting. (Tr. at 26-28.) Until Rush took inside
painting jobs in 1998, she had worked continuously as a bridge painter, excepting some off-
season periods on jobs that did not "go through the winter." (Tr. at 28.)

        Rush became interested in a DOT Bridge Painter position because it offered stable
benefits and a consistent work schedule. (Tr. at 31.) In late 1997 or early 1998, Rush applied for
the provisional Bridge Painter position with the DOT. (Stipulated Fact No. 6.) DOT never
contacted her for an interview, and, as 1998 unfolded, Rush could not find steady work in the

-8-

private sector. (Tr. at 29, 43; Stipulated Fact No. 26.)  Rush eventually contacted Powell and learned that DOT would not hire her because she did not have a CDL. (Tr. at 36-37.)  Rush remained in contact with Local 806 to check on job openings for the next three years, but found no further full-time work as a bridge painter. (Tr. at 29, 44.)

In August 2001, Rush submitted a second resume to the DOT but was never called for an interview. (Tr. at 40.)  In 2004, she moved to South Carolina. (Tr. at 77.)

b.  Helen Jackson

Jackson applied and was admitted to the Local 806 apprenticeship program in March 1992. (Tr. at 90.)  That same month, she started as an apprentice with the Four Silver Star Company working on highway overpasses, including the Clearview Expressway, Cross-Island Parkway, and Grand Central Parkway. (Tr. at 92, 94-95.)  Her duties were mixing paint and providing journeymen painters with supplies. (Tr. at 95.)  From April to November 1993, Jackson worked as an apprentice for George Campbell on the Chelsea Piers structural steel skeleton. (Tr. at 95-97.)  Jackson also obtained certificates in lead abatement and Hazmat work—such as proper use of protective suits, moving scaffolding, and containment procedures—through the Local 806 apprenticeship program. (Tr. at 93-94.)

After graduating in early 1994, Jackson worked full-time from March to November 1994 for Yonkers Construction on the structural-steel overpasses of the Brooklyn-Queens Expressway (the "BQE"), where she painted on scaffolding approximately 20 to 30 feet off the ground. (Tr. at 91-92, 97-98.)  In March 1995, Jackson again began full-time work for Keystone Construction ("Keystone") on the structural steel of the Triborough Bridge along the Bruckner Expressway. (Tr. at 98-99.)  In this position, Jackson removed rust and paint with

-9-

sanders and needle guns and built and worked within lead containment. (Tr. at 99-100.) Her job with Keystone concluded in October 1995. (Tr. at 100.) At some point in late 1995, Jackson submitted a resume to DOT for the Bridge Painter position but was never contacted. (Tr. at 105-07.)

In March 1996, Jackson started work with L&L Painting as a journeyman bridge painter on the Tappan Zee Bridge catwalk. (Tr. at 100.) She removed sand from the blasters, applied new paint to the bridge, moved material, and performed containment. (Tr. at 100-01.) She completed her work with L&L Painting on the Tappan Zee Bridge in September 1996. (Tr. at 101.) Jackson was not able to find jobs during the winter months. (Tr. at 101.)

From May to August 1997, Jackson worked full-time on structural steel along the Amtrak tracks on the Hudson River Parkway. (Tr. at 101-02.) When that job ended, Jackson had difficulty finding new bridge painting jobs. She was able to secure only two months of work with George Campbell on the George Washington Bridge. (Tr. at 102-03.) This was her last bridge painting job—after September 1998, Jackson was unable to find work in bridge painting. (Tr. at 103.) In 1998, Jackson updated her old resume and resubmitted it to the DOT. (Tr. at 107.) DOT never interviewed her. (Stipulated Fact. No. 27.)

c.  Luzia Oliskovicz

Oliskovicz began working as a bridge painter in 1988 for George Campbell. (Tr. at 576.) She completed training in the Local 806 apprenticeship program. (Tr. at 576-77.) After graduating, Oliskovicz worked for ten years as a journeyman bridge painter. (Tr. at 576-77.) She continued at George Campbell—working March through November each year—until 1992, when she moved to a job with a company called Dynamic on the Hudson River Parkway. (Tr. at

-10-

579-80.) On that job, Oliskovicz constructed rigging, built scaffolding, and removed paint and rust with air compressors. (Tr. at 580.) She then worked for Yonkers Construction on the Manhattan Bridge, using needle guns and chisel needles to remove rust and paint while positioned under the train tracks. (Tr. at 581.) Oliskovicz continued thereafter on a number of projects on elevated steel structures sandblasting, removing paint with power tools, and painting. (Tr. at 581-82.)

Oliskovicz applied for the Bridge Painter position in response to the 1999 Posting. (Stipulated Facts Nos. 15, 28.) The Defendants determined that Oliskovicz satisfied the DOT Five-Year Experience Requirement for the Bridge Painter position. (Stipulated Fact No. 29.) At the time of her application, Oliskovicz did not hold a CDL but was taking classes to earn the license. (Tr. at 583.) She also moved to New York City a few weeks after applying on the belief that she had to reside within the five boroughs. (Tr. at 584.) On September 29, 1999, DOT interviewed Oliskovicz but never offered her a job. (Stipulated Facts Nos. 15, 16.) Since that time, Oliskovicz has worked as an interior painter. (Tr. at 589.)

d. Efrosini Katanakis

Katanakis has worked as a bridge painter for approximately 20 years. (Tr. at 550.) She started in 1987 for a company called Promo Pro. (Tr. at 550-51.) Katanakis continued with that company for ten years doing sandblasting, waterblasting, painting, building and breaking down rigging, and constructing containment. (Gov. Ex. 15: Resume of Efrosini Katanakis dated Apr. 19, 2001 ("Katanakis Resume") at Bates No. 00318.) She constructed containment systems for the Bear Mountain Bridge, the BQE, the Eastern Parkway, the

-11-

Verrazano Bridge, the Manhattan Bridge, the Brooklyn Bridge, and jet fuel tanks at an airport. (Tr. at 552-53.)

In the late 1990s, Katanakis applied to the Local 806 apprenticeship program so she could join the union and obtain steady full-time work in New York City. (Tr. at 556.) She continued to work for Promo Pro while completing the program. (Tr. at 557.)

From February 1999 through October 2000, Katanakis worked for Liberty Maintenance performing blasting and painting, and building rigging, platform scaffolding and containment on the Major Deegan Expressway. (Tr. at 557-58; Katanakis Resume.) From October to December 2000, she performed similar work on the Manhattan Bridge and erected scaffolding and containment that wrapped around the bridge towers. (Tr. at 558; Katanakis Resume.) Throughout her career, Katanakis has worked continuously during bridge painting season and worked indoors during the winter months. (Tr. at 555.)

Katanakis applied for the DOT Bridge Painter position in response to the 2001 Postings. (Stipulated Facts Nos. 31, 38.) DOT determined that she met the Five-Year Experience Requirement and interviewed her on August 30, 2001, but she never heard from City again. (Stipulated Facts Nos. 32, 38; Tr. at 562.)

III.   Provisional Bridge Painter Hiring

a.   1997-1998 Postings

In 1997, the DOT considered twenty-two male applicants and two female applicants—Rush and Jackson—for ten new Bridge Painter positions. (Stipulated Facts Nos. 6, 8, 10.) Acting Director Tohl reviewed each resume to determine whether the applicant met the

-12-

Five-Year Experience and Class B License Requirements. (Tr. at 147, 175-76.) Tohl was unaware of any civil service guidelines for provisional employees and "depended on personnel to guide [him] in hiring procedures." (Tr. at 175-76.) Tohl acknowledged he did not apply the Five-Year Experience Requirement strictly and interviewed candidates even "[i]f they were slightly short." (Tr. at 174.) That concession contradicts other DOT officials, including Levit, who insisted that the Five-Year Experience Requirement was rigidly measured by months worked—that is, 60 months of work experience in the previous ten years. (Tr. at 167-68, 245-55, 770-76.) Defendants do not cite any written policy or document defining the experience requirement as 60 months. (See Tr. at 169.)

In February 1998, DOT interviewed seventeen of the twenty-two male applicants and neither female applicant. (Stipulated Fact No. 7; Tr. at 40, 108.) According to Powell, the "only" applicants not called in for interviews in February 1998 were Rush and Jackson. (Tr. at 385.) Powell testified that she received Rush's resume and tried to schedule an interview for her. (Tr. at 385-86.) However, Powell could not reach Rush at the phone number on her resume. (Tr. at 386.) Powell made no other effort to contact Rush, nor did she ask Local 806 for assistance. (Tr. at 386.) Jackson, the other female applicant, was not scheduled for an interview because her resume was marked NQ by an unknown person. (Tr. at 383; Gov. Ex. 7: Resume of Helen Jackson ("Jackson Resume").)

As a result of the 1998 interviews, DOT appointed ten men as provisional Bridge Painters: Thomas Anzalone, Julio Brito, Thomas Jones, Nicholas Krevatas, Goncalo Lima, Arlindo Lima, Drago Milin, Joao Nascimento, Milan Radovic, and Michael Scotti. (Stipulated Facts Nos. 8, 10.) DOT recommended the hiring of two additional candidates—Christopher

-13-

Serino and Ivan Bogovic—but ultimately did not extend offers for reasons unrelated to their sex or work experience. (Stipulated Fact No. 9.)

At least six of the male candidates interviewed in February 1998—including two who were offered provisional positions—had less than sixty months of work experience as bridge painters. (Gov. Ex. 3: Resumes from 1997-1998 Postings ("1997-1998 Resumes") at Bates Nos. 00258 (Thomas Anzalone), 00259 (Frank Duic), 00272 (Carlos Estrada), 00276 (Christopher Serino), 00282 (Dennis Kenny); Gov. Ex. 11: Resumes from 1999 Posting ("1999 Resumes") at Bates No. 00293 (Frank Mota).) Interviewee Dennis Kenny had only two years of qualifying experience. (Tr. at 160.) Indeed, two men interviewed—Frank Mota and Carlos Estrada—had no qualifying work experience whatsoever, as established by their resumes and by testimony of Tohl and Defendants' Rule 30(b)(6) witness Paul Kahn. (Tr. at 160-61, 737-38.) In contrast to Rush, while the phone number on Christopher Serino's resume was crossed out, a new number was handwritten in its place. (1997-1998 Resumes at Bates No. 00276.)

b. 1999 Posting

In July 1999, DOT received applications from twelve men and two women— Jackson and Oliskovicz—in response to the 1999 Posting for provisional Bridge Painters. (Stipulated Facts Nos. 13, 14, 27, 28.) There were nine vacant budgeted positions at that time. (Stipulated Fact No. 40.) Levit testified that Powell was solely responsible for screening these resumes and that he saw resumes for the first time at the interviews. (Tr. at 245-46, 252.) According to Levit, Powell's review included a "very thorough" and "by the book" screening of qualifications, particularly the Five-Year Experience Requirement. (Tr. at 252-55.) Powell contradicted Levit and testified that she never reviewed resumes to determine whether applicants

-14-

met the Five-Year Experience Requirement, that Levit never delegated that responsibility to her, and that she would not have known how to make such a determination. She also never flagged a resume as unqualified for lack of experience. (Tr. at 412-14.)

The DOT selected Oliskovicz and nine of the twelve male applicants for interviews in September 1999. (Stipulated Fact No. 15.) Although no DOT employee knows who marked Jackson's resume with an NQ, Defendants maintain that her failure to meet the Five-Year Experience Requirement was the reason she was again not selected for an interview in 1999. (Defendants' Proposed Findings of Fact & Conclusions of Law dated Nov. 29, 2009 at ¶ 95; Jackson Resume; see also Stipulated Fact No. 27.)

It is undisputed that the Bridge Painter Section did not require applicants for provisional Bridge Painter to demonstrate any practical skills during the interview process, although practical skills testing was part of the civil service examination for the Bridge Painter position. (Tr. at 150, 270.) Rather, during the September 1999 interviews, each candidate was asked an identical set of eighteen questions on technical knowledge. (Stipulated Fact No. 15; Tr. at 259, 267; Def. Ex. EE: Questions for Bridge Painters ("Interview Questions").) Levit alone scored each candidate. (Tr. at 263, 270-72; see Interview Questions.) After the interviews, Levit ranked the candidates based on their scores and then sent his recommended hires to the personnel office. (Tr. at 272.) Although other interview panel members could take notes, the panel did not compare scores or review Levit's scores and candidate rankings. (Tr. at 265-66, 272.)

Levit was unimpressed by Oliskovicz's interview. According to him, she could not answer "a single technical question" unless asked "several times" and was "silent" after several questions. (Tr. at 321.) Oliskovicz, whose first language is Portuguese, testified that she

-15-

could not understand Levit, who speaks with a heavy accent. (Tr. at 585-86, 588.) To address this issue, Levit deviated from the script for each question and "rephrased" it to "help" her understand what he was asking. (Tr. at 321-22.) Although other candidates who could not understand Levit were read the questions by another panel member (Tr. at 261), this courtesy was not extended to Oliskovicz. (Tr. at 587; see also Tr. at 321-22). After the interview, Levit gave Oliskovicz a score of zero—having given no answer—on five questions. (Tr. at 322.) Oliskovicz disputes that and claims to have answered at least two of the five questions. (Tr. at 586-87.) Powell corroborated Oliskovicz and asserted that she answered questions once they were repeated. (Tr. at 419-20.)

While Levit recalls Oliskovicz's answers, he could not remember the interview answers of any other candidate, as "[i]t is obviously impossible to have such a memory." (Tr. at 319-20.) Credible testimony contradicts Levit's account that Oliskovicz was unresponsive to his questions or that he tried to assist her during the interview. (Tr. at 419-20, 586-88.) Levit's demeanor on the stand and his frequent impeachment on cross-examination undermined his testimony. This Court credits Oliskovicz's and Powell's testimony on this matter.

Based on his scoring of the 1999 interviews, Levit ranked the candidates in the following order: (1) Brian Casey, (2) Frank Duic, (3) Jose Melo, (4) Arlindo Andrade, (5) Anthony Urban, (6) Frank Mota, (7) Luzia Oliskovicz. (Tr. at 322-24; Def. Ex. EE: Scored and ranked question forms for 1999 applicant interviews.) The top two candidates, Brian Casey and Frank Duic, were hired in 2000. (Stipulated Fact No. 16; Gov. Ex. 121A: Memorandum from DOT Personnel Coordinator dated Jan. 10, 2000.) After her interview, Oliskovicz never heard

from DOT. (Tr. at 588-89; see Stipulated Fact No. 30.) According to Levit, budget cutbacks prevented him from hiring seven Bridge Painters, including Oliskovicz. (Tr. at 325-28.)

### c. Appointment of Anthony Attore

In June 2000, Levit conducted an "orientation" interview for Anthony Attore, a candidate who originally interviewed with Tohl after the 1997-1998 Postings but did not receive an offer. (Tr. at 329-33; Stipulated Fact No. 11.) Although Attore had not applied in connection with the 1999 Posting, his resume was resubmitted by Louie Hernandez, a former DOT employee working at City Hall. (Stipulated Fact No. 17; Tr. at 630.) Levit recounted Attore's hiring as follows:

> He came and he was in clean clothes, he had good English, okay, and so he can understand command of supervisors, and based on that, okay, I didn't see anything that have to be reported to personnel department that something outrageous happened during his interview.

(Tr. at 332.) Levit further conceded that he had approved Attore because "he look like very strong guy." (Tr. at 323 (in original).) Attore was appointed as a provisional Bridge Painter in August 2000. (Stipulated Fact No. 18.)

### d. 2001 Postings

In April and May 2001, DOT issued vacancy notices for provisional Bridge Painter positions and received resumes from sixteen male applicants and one female applicant—Katanakis. (Stipulated Facts Nos. 21, 22, 31.) The DOT determined that Katanakis satisfied the Five-Year Experience Requirement for the position. (Stipulated Fact No. 32.)

On August 30, 2001, DOT interviewed eight male applicants and Katanakis. (Stipulated Fact No. 23.) The interviews were conducted by a panel comprised of Levit,

-17-

Babajko, and Jure Dzida ("Dzida"), a supervising Bridge Painter. (Stipulated Facts No. 23.)

Powell and Michele Vulcan ("Vulcan"), an EEO liaison, were also present. (Stipulated Fact

Nos. 23, 24.) For this set of interviews, Levit prepared a new set of questions which had been

reviewed by DOT's EEO office. (Tr. at 256-57.) Following the interviews, Levit, Babajko,

Dzida, and Powell met briefly to discuss the candidates. (Tr. at 611-12.) The group appeared to

reach a "consensus" as to the three applicants to hire—Anthony Urban, George Krevatis, and

Diantamino Lima ("Lima"). (Tr. at 612-13.) According to Levit, Katanakis was not selected on

the basis of her interview performance.

        DOT representatives disagree sharply over what occurred during Katanakis's

interview. Levit described Katanakis as acting both "irritated" and "confrontational" and further

stated, "She was offensive." (Tr. at 345-51.) At his deposition, Levit described her as "erratic."

(Tr. at 345-47.) In contrast, Powell testified that Levit tried to accommodate Katanakis more

than he did other candidates and that he coaxed answers from her. (Tr. at 436-37.) It appears

that both Katanakis and Lima received assistance from Levit. (Tr. at 507-09.) Moreover,

contrary to Powell's assertions, the male applicant Lima received the most assistance from Levit,

which led Vulcan to remove Levit from the room to discuss his coaching behavior. (Tr. at 614-

15.)

        This series of interviews produced no provisional hires. (Stipulated Fact No. 45.)

    e.  2002 Posting

        In 2002, Levit sought and received approval to recruit five additional Bridge

Painters. (Stipulated Fact Nos. 41, 43.) However, due to budgetary constraints, DOT ultimately

did not interview any applicants. (Stipulated Fact No. 44; Tr. at 693-703; Def. Ex. WWW:

-18-

Email from Alice Todd dated July 25, 2002; Def. Ex. XXX: Nov. 2002 Financial Plan Changes;

Def. Ex. ZZZ: Email from Henry Perahia dated Jan. 28, 2003; Def. Ex. BBBB: FY 2003 & 2004

Executive Budget – Expense Reduction & Revenue Proposals; Def. Ex. DDDD: Email from

Joseph Lamberson dated June 9, 2003; Def. Ex. EEEE: Email from Dorothy Roses dated Oct. 6,

2003.) No provisional Bridge Painters have been appointed since 2001. (Stipulated Fact No.

45.)

## IV.   Bridge Painter Facilities & Hostile Environment Issues

### a.   Facilities for Female Bridge Painters

The total absence of female Bridge Painters was well-known to DOT supervisors.

Local 806 officials raised the issue on two occasions with Levit, Powell, and Levit's supervisor

Henry Perahia. (Tr. at 487-490, 528-530.) DOT supervisors responded to both inquiries by

citing the absence of female decontamination facilities—such as garment changing areas and

showers—as a bar to interviewing or hiring women. (Tr. at 488-89, 527-28.)

Changing facilities for DOT Bridge Painters must include a special "dirty" area

where painters can remove lead paint from their clothing. (Tr. at 645.) DOT provides Bridge

Painters these facilities in large trailers at various locations throughout the City. (Tr. at 644-48.)

Defendants contend that they developed plans for female changing facilities at the Queensboro

Bridge and, in any event, that they maintained adequate existing facilities for women to remove

lead paint. (Tr. at 644-45.) Levit testified that when Local 806 officials spoke with him, DOT

had sufficient locker room space to accommodate female Bridge Painters at a facility on

Greenpoint Avenue in Brooklyn. (Tr. at 215.) He testified further that this locker room space

has been empty and unused since 1999 because male Bridge Painters are banned from it. (Tr. at 219-20.)

However, Levit's testimony was directly contradicted by Tohl, Babajko, and DOT Executive Director Dorothy Roses ("Roses"). According to Tohl, there were no facilities for female bridge painters available in either 1997 or 1998. (Tr. at 172-73.) Babajko testified that the Greenpoint Avenue trailer was continuously used by male painters, except during the winter months when all Bridge Painters are transferred to Staten Island. (Tr. at 501-02.) Importantly, Roses conceded that the first facility equipped with female locker rooms was completed in 2001 and then turned over for use by male painters in 2002. (Tr. at 637-38.) This Court credits Tohl, Babajko, and Roses's testimony on this matter.

b.  Hostile Environment Issues

Beginning in the spring of 1999, it was obvious to DOT officialdom that certain male Bridge Painters would not welcome women to their job sites. (Tr. at 229.) This was particularly evident given the manner in which certain male painters treated Powell, the only woman in constant contact with the Bridge Painter Section. In April 1999, after Powell found sexually-explicit materials at the Greenpoint Yard, Levit issued a memorandum to the Bridge Painter Section reminding male Bridge Painters not to keep "dolls, [] sexual photographs, cartoons or drawings" in the workplace. (Gov. Ex. 132: Memorandum from Levit dated Apr. 5, 1999.)

Powell also experienced gender-based resentment from the rank-and-file after she was promoted to Deputy Director and assigned to oversee Bridge Painters in 1999. (Tr. at 440-41.) She testified that some of the Bridge Painters "just didn't want me around them." (Tr. at

-20-

441.) Shortly after her promotion, two male Bridge Painters at the Greenpoint Yard filed false

charges of sexual harassment against Powell in what she perceived as an effort to get her fired.

(Tr. at 440-41.) In addition, certain Greenpoint Yard Bridge Painters threatened Powell, telling

her to "watch [her] back," and she learned that others called her a "bitch" outside her presence.

(Tr. at 441-42.)

Following an EEO investigation, DOT required "all personnel at the Greenpoint

Yard be scheduled for EEO training covering diversity of ethnicity and gender within the

workplace." (Gov. Ex. 130: Memorandum from Ann Williams, Director of EEO dated Oct. 29,

1999, at 7; Tr. 466.) Wilbur Chapman, the DOT Commissioner, reviewed the EEO investigation

and adopted the finding that "assignment of a female supervisor has obviously caused

resentment." (Gov. Ex. 129: Determination After Report and Recommendation from Wilbur

Chapman, Commissioner dated Oct. 14, 1999, at 1-2.)

## CONCLUSIONS OF LAW

I.   The Pattern or Practice of Disparate Treatment Claim

   a.   Legal Standard

Title VII of the Civil Rights Act of 1964, § 703(a), 42 U.S.C. § 2000e et seq.,

prohibits various forms of employment discrimination on the basis of race, color, religion, sex, or

national origin. Title VII prohibits both intentional discrimination—known as disparate

treatment—and unintentional discrimination practices which have a disproportionately adverse

effect on a protected class—known as disparate impact. See Ricci v. DeStefano, 129 S. Ct.

-21-

2658, 2672 (2009). This is a disparate treatment case for sex discrimination in the City's hiring practices.

Disparate treatment cases are "the most easily understood type of discrimination" because the "employer simply treats some people less favorably" because they possess a protected trait. Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977). Accordingly, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Unlike disparate impact claims, disparate treatment claims require proof of an employer's discriminatory motive, which "can in some situations be inferred from the mere fact of differences in treatment." Teamsters, 431 U.S. at 335 (citing Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 265-66 (1977)).

In a "pattern-or-practice" disparate treatment case, proof of discrimination focuses on "widespread acts of intentional discrimination against individuals." Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 158 (2d Cir. 2001). "To succeed . . . plaintiffs must prove more than sporadic acts of discrimination; rather, they must establish that intentional discrimination was the defendant's standard operating procedure." Robinson, 267 F.3d at 158 (quoting Teamsters, 431 U.S. at 336) (emphasis added). Accordingly, "the initial focus in a pattern-or-practice case is not on individual employment decisions" but on the existence of multiple related acts of discrimination. Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1106 (10th Cir. 2001) (internal citations and quotation marks omitted); see also Robinson, 267 F.3d at 158 n.5 (distinguishing pattern-or-practice disparate treatment claims from individual

-22-

disparate treatment claims proceeding under the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).

The plaintiff has the "initial burden . . . to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers." Teamsters, 431 U.S. at 360. To establish liability, "the Government is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy. Its burden is to establish a prima facie case that such a policy existed. The burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the Government's proof is either inaccurate or insignificant." Teamsters, 431 U.S. at 360. This burden shifting is not "intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983) (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)). Ultimately, where a plaintiff meets its burden of production and the defendant articulates a legitimate, non-discriminatory reason for its behavior, all presumptions drop from the analysis and the fact-finder simply decides "whether [by a preponderance of the evidence] the defendant intentionally discriminated" on the basis of sex. Aikens, 460 U.S. at 715; Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-54 (1981); see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-12 (1993) ("If, on the other hand, the defendant has succeeded in carrying its burden of production, the McDonnell Douglas framework—with its presumptions and burdens—is no longer relevant.").

b. Government's Proof of Discrimination

"Plaintiffs have typically depended upon two kinds of circumstantial evidence to establish the existence of a policy, pattern, or practice of intentional discrimination: (1) statistical evidence aimed at establishing the defendant's past treatment of the protected group, and (2) testimony from protected class members detailing specific instances of discrimination." Robinson, 267 F.3d at 158 (internal citations omitted). While most pattern-or-practice claims are proven through the use of statistics, "when there is a small number of employees, anecdotal evidence alone can suffice." Sidor v. Reno, No. 95 Civ. 9588 (KMW), 1997 WL 582846, at *10 (S.D.N.Y. Sept. 19, 1997); see Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79, --- F. Supp. 2d ----, Nos. 03 Civ. 4399 (RJH), 09 Civ. 6520 (RJH), 2009 WL 3103783, at *11, 14 (S.D.N.Y. Sept. 29, 2009); McReynolds v. Sodexho Marriott Serv., Inc., 349 F. Supp. 2d 1, 7 (D.D.C. 2004) ("To establish a prima facie pattern or practice case, the plaintiffs must, by statistical evidence, individual testimony, or a combination of the two, make a showing adequate to raise the inference that employment decisions were predicated on an illegal criterion." (internal quotation marks and citation omitted)); see also E.E.O.C. v. LA Weight Loss, 509 F. Supp. 2d 527, 533 (D. Md. 2007) ("'This prima facie showing may in a proper case be made out by statistics alone, or by a cumulation [sic] of evidence, including statistics, patterns, practices, general policies, or specific instances of discrimination.'" (quoting E.E.O.C. v. Am. Nat'l Bank, 652 F.2d 1176, 1188 (4th Cir. 1981))).

This case was litigated without resort to statistical evidence other than the elephant in the room—the incontrovertible fact that DOT has never hired a provisional female Bridge Painter. Because this case proceeded without the use of statistics, the Government did

-24-

not seek an inference of discrimination based on the "inexorable zero" in DOT's hiring. See Teamsters, 431 U.S. at 342 n.23; Loyd v. Phillips Bros., Inc., 25 F.3d 518, 524 n.4 (7th Cir. 1994) ("For instance, the 100% sex-segregated workforce is highly suspicious and is sometimes alone sufficient to support judgment for the plaintiff."). Yet evidence of an "inexorable zero" is still relevant. First, a court cannot help but be circumspect where a municipal department in the country's largest city repeatedly selects only applicants of one sex for job vacancies—after all, "zero is not just another number." Barner v. City of Harvey, No. 95 Civ. 3316, 1998 WL 664951, at *50 (N.D. Ill. Sept. 18, 1998); see also Capaci v. Katz & Besthoff, Inc., 711 F.2d 647, 662 (5th Cir. 1983) ("To the noble theoretician predicting the collisions of weightless elephants on frictionless roller skates, zero may be just another integer, but to us it carries special significance in discerning [] policies and attitudes."). Second, even in cases where there is a weak inference of an "inexorable zero" or "scant evidence of other women who applied and were rejected," a court should consider that this "lack of evidence may itself be attributable to the 'inexorable zero.'" Ortiz-del Valle v. Nat'l Basketball Ass'n., 42 F. Supp. 2d 334, 337-38 & n.1 (S.D.N.Y. 1999).

Regardless of the weight given to the total absence of female hires, the remaining anecdotal evidence was more than sufficient to show that DOT lacked consistent hiring standards in the Bridge Painter Section, that less qualified men were given preferences over more qualified women, and that the disparate treatment was intentional appeasement of DOT's existing all-male workforce.

### 1.  Absence of Hiring Standards

The Defendants carried out provisional hiring without meaningful objective standards or consistent guidelines.  While an employer's use of certain subjective hiring criteria, "such as the impression an individual makes during an interview," is not per se unlawful, Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 104 (2d Cir. 2000), "'subjective and ad hoc' employment practices . . . bolster [a] plaintiff['s] claim that defendants discriminated against class members."  Wright v. Stern, 450 F. Supp. 2d 335, 365-66 (S.D.N.Y. 2006) ("Multiple courts have observed that greater possibilities for abuse . . . are inherent in subjective definitions of employment selection . . . .") (citing Davis v. Califano, 613 F.2d 957, 965 (D.C. Cir. 1979); Rogers v. Int'l Paper Co., 510 F.2d 1340, 1345 (8th Cir. 1975)).  Indeed, "[d]epartures from procedural regularity . . . can raise a question as to the good faith of the process where the departure may reasonably affect the [employment] decision."  Stern v. Trustees of Columbia Univ. in City of N.Y., 131 F.3d 305, 313 (2d Cir. 1997) (quoting Zahorik v. Cornell Univ., 729 F.2d 85, 93 (2d Cir. 1984)) (internal quotation marks omitted).  In that vein, the Court of Appeals has observed that "subjective word-of-mouth hiring methods" are suspect and used to mask ongoing bias.  See Grant v. Bethlehem Steel Corp., 635 F.2d 1007, 1015 (2d Cir. 1980).  Further, hiring practices or tests that, while neutral on their face, serve only to perpetuate past imbalances violate Title VII.  E.E.O.C. v. Int'l Union of Operating Eng'rs, 553 F.2d 251, 255 (2d Cir. 1977) ("It is established law that practices, procedures or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices . . . and that practices which 'perpetuate' past discrimination violate the Act." (citing Griggs v. Duke Power Co., 401 U.S. 424, 430 (1971))).

The DOT and Bridge Painter Section departed from procedural regularity in multiple respects. Foremost, the provisional hiring system lacked written standards with specific instructions to guide DOT personnel in provisional hiring. There were simply no mechanisms to ensure that the persons tasked with hiring were employing permissible criteria in their selection of applicants. As Tohl testified, he was not aware of any regulations that governed hiring of provisional painters. Instead, the only consistent practice at DOT was that complete discretion and authority was vested in the head of the Bridge Painter Section. Beginning with Tohl in 1998 and increasing through Leonid Levit's tenure, Bridge Painter hiring was not the result of a deliberative and straightforward process, but subject to the personal proclivities of the director of the Bridge Painter Section. Notably, no one at DOT knew who was responsible for marking resumes as not qualified with an "NQ." Although Levit testified that resume review was "very thorough," the record shows otherwise—when a resume was marked NQ, as Jackson's was, no further notation explained why. When challenged on this practice, Levit pointed the finger at Powell, and she pointed it right back, while the City simply explained that those decisions were "determined by DOT." Thus, the situation was ripe for male and female applicants to face differential treatment.

The in-person interviews were also deeply flawed. First, contrary to long-established public employment law and practice, no written notes memorialize the 1998 interviews. See 42 U.S.C. § 2000e-8; 29 C.F.R. § 1602 et seq. (relating to Title VII recordkeeping requirements); Byrnie, 243 F.3d at 98-99, 104-05 (outlining school's comprehensive interviewing procedures and consequences for not retaining records for the hiring process). Under Levit's leadership, candidates were asked questions by Levit or by other panel

-27-

members, depending on whether each candidate was able to understand Levit's heavy accent.

Although the questions Levit asked in the 1999 interviews called for written notations on

responses, his notes were limited to "yes" and "no" as opposed to written summaries of the

candidate's answers. Finally, none of the other interviewing panelists reviewed Levit's scoring

of candidates or meaningfully engaged in a deliberative process. Rather, based on Powell's

description, candidates were selected during a short huddle at the end of the day. The

opportunities were plentiful for giving preferential treatment to one group over another in this

environment of minimal oversight unblemished by paper trails.

### 2.  Preferences to Less Qualified Men

An essential element in any Title VII action in which qualifications are in dispute

is demonstrating that persons in the protected class possessed comparable qualifications yet were

repeatedly subject to adverse employment decisions. See Grant, 635 F.2d at 1018; see also

McDonnell Douglas, 411 U.S. at 802. Where a "reasonable employer would have found the

plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder

can legitimately infer that the employer consciously selected a less-qualified candidate—

something that employers do not usually do, unless some other strong consideration, such as

discrimination, enters into the picture." Jackson v. Gonzales, 496 F.3d 703, 707 (D.C. Cir. 2007)

(citations omitted). In some circumstances, "qualifications evidence may suffice . . . to show

pretext." Ash v. Tyson Foods, Inc., 546 U.S. 454, 457 (2006) (citing Patterson v. McLean Credit

Union, 491 U.S. 164, 187-88 (1989)). But see Burdine, 450 U.S. at 259 ("The fact that a court

may think that the employer misjudged the qualifications of the applicants does not in itself

-28-

expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination.").

The Supreme Court has cautioned that the qualifications disparity need not "jump[] off the page to slap you in the face." Ash, 546 U.S. at 457. Rather, the disparity should be enough that "a reasonable employer would have found the plaintiff to be significantly better qualified for the job." Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc); see also Raad v. Fairbanks North Star Borough Sch. Dist., 323 F.3d 1185, 1194 (9th Cir. 2003) (adopting "clearly superior" qualifications standard).

Some of the Government's evidence regarding whom DOT chose to fill positions did "jump off the page." Cofield v. Goldkist, Inc., 267 F.3d 1264, 1268 (11th Cir. 2001). However, on the whole, the Government effectively wove together numerous anecdotal instances of less qualified men receiving preferential treatment. Proceeding without statistical evidence, the Government showed that the relevant decision makers at DOT always chose a man for a position when a more qualified female candidate was available. See Robinson, 267 F.3d at 158-59 (citing Mozee v. Am. Commercial Marine Serv. Co., 940 F.2d 1036, 1051 (7th Cir. 1991)).

DOT's differential treatment was most apparent in its "strict" application of job requirements to Rush and Jackson vis-à-vis numerous male applicants. This is particularly perplexing given that the DOT needed to repeatedly expand its applicant pool given the lack of interest in the position. The City's contention that the Five-Year Experience Requirement meant 60 months of prior work experience is without merit. The vacancy notices refer only to "five years" of experience, and the Government showed that a "year" in the profession of bridge painting is flexibly defined—lasting between seven and nine months depending on the weather.

Moreover, DOT Bridge Painters winter on Staten Island (the City's southernmost borough) as opposed to painting elevated steel structures in the open air. Thus, under the City's proffered definition, even its own "full-time" Bridge Painters do not work full-time. Contrary to the City's assertions, the evidence demonstrated that a "year" of qualifications did not mean 12 months of painting work, but full-time seasonal employment during a calendar year.

## A. Rush & Jackson

Both Rush and Jackson were more qualified than male applicants given employment preferences by DOT. At the time DOT conducted interviews in early 1998, Rush and Jackson each met the Five-Year Experience Requirement. Rush had achieved the status of journeywoman painter with Local 806 and had worked on numerous projects in the prior decade. Moreover, her completion of the Local 806 apprenticeship program and ability to do grueling work like "running the hoppers" clearly distinguished her as qualified. Jackson also completed the apprentice program and had five years of experience when she submitted her resume in 1998 or 1999. Defendants' contention that she was not qualified for the position when her resume was rejected for a second time in 1999 is unsupported by the evidence.

Even accepting the Defendants' construction of the Five-Year Experience Requirement, the evidence still shows that the City applied its policy differently to men and women. Thomas Anzalone, who was interviewed and appointed over Rush and Jackson, began painting in 1993—one year after Jackson and nine years after Rush. Unlike Rush and Jackson, his resume was not detailed, but broadly stated that he painted from "Winter 93 to present." Christopher Serino, who was interviewed but not hired, began painting in 1991 and had work experience similar to Rush's. Similarly, neither Frank Duic nor Dennis Kenny met the Five-

Year Experience Requirement yet both received interviews. Finally, Frank Mota and Carlos Estrada submitted resumes showing <u>no</u> experience as a bridge painter—Estrada was a general day laborer and Mota had most recently managed an airline's commissary building and ground operations at JFK International Airport.

With respect to the CDL requirement, most candidates did not possess a CDL at the time of their interview. Defendants did not premise their failure to interview Rush or Jackson on the CDL requirement at trial and, given the leniency toward men, such a justification would not have been supported by the evidence.

### B.  Oliskovicz

Oliskovicz was also more qualified than certain male applicants who received preferential treatment in hiring. Oliskovicz met the Five-Year Experience Requirement, under either party's interpretation, and was taking classes to obtain her CDL at the time of her interview. The City all but acknowledges that she was well qualified for the job and bases its rejection on her interviewing skills and a budget shortfall.

Although the City may use subjective criteria in evaluating a candidate, <u>Byrnie</u>, 243 F.3d at 104, the record shows that Oliskovicz's interview performance alone could not have disqualified her from the position or placed her behind applicants like Frank Mota (as she ultimately was). Although Oliskovicz had difficulty understanding some of Levit's questions, when it came to the substance of her answers, this Court credits her testimony over Levit's and finds that she gave appropriate responses.

Accordingly, there was no legitimate business reason for Levit to rank Oliskovicz seventh after the interviews. Although only the top two candidates—Brian Casey and Frank

Duic—were hired, several less qualified male candidates were ranked higher than Oliskovicz. The creditability of Levit's rankings is completely undermined by his listing Frank Mota, the former airline ground manager for TWA, as higher than Oliskovicz. Even the City's Rule 30(b)(6) witness conceded that Mota was "obviously not qualified." The testimony offered to justify Mota's ranking was unconvincing, and the inference of discrimination in the Defendants' treatment of Oliskovicz is very strong.

### C. Katanakis

Like Oliskovicz, Katanakis was deemed qualified by DOT yet was denied a position after her interview with Levit. Once again, in disregard of established record-keeping requirements, Levit did not preserve his 2001 interview notes, so the only evidence of Katanakis's interview comes from the individuals involved. Although Levit claims he treated Katanakis and male applicants similarly, this contention, like so many of Levit's, cannot be believed. Levit characterized Katanakis as "irritated," "erratic," and "confrontational" in her job interview. Moreover, any claim by Levit that he objectively reviewed candidates was directly contradicted by his description of his interview of Anthony Attore just a year earlier, whom Levit found acceptable because he looked "strong" and did nothing "outrageous" during their meeting.

Throughout three consecutive DOT vacancy periods,[3] every female applicant for the Bridge Painter position was subjected to less favorable treatment than lesser qualified male applicants. In addition, word-of-mouth recruiting and nepotism in DOT's hiring practices reinforced existing gender disparities. See Thomas v. Washington Cty. Sch. Bd., 915 F.2d 922,

---

[3] Because DOT neither interviewed nor hired following the 2002 Posting, that period is excluded from consideration in the pattern or practice claim.

925-26 (4th Cir. 1990) ("These policies and practices amount to nepotism and word-of-mouth

hiring, which, in the context of a predominantly white work force, serve to freeze the effects of

past discrimination."). Consideration of cronyism is warranted in a Title VII action. See

generally Wards Cove Packing Co., Inc. v. Atonio, 490 U.S. 642, 655 n.9 (1989) (noting that

nepotism is a factor subject to Title VII challenge in a disparate impact case) (superseded by

statute at Pub. L. No. 102-166, 105 Stat. 1071 (1991)). Although the City downplays the hiring

of Anthony Attore as a decision made by City Hall, the Government showed that Levit and DOT

were closely involved in that decision. Moreover, since the City is a Defendant in this action, the

Government need not show that only personnel of the Bridge Painter Section used cronyism to

reinforce the existing gender imbalance—other city employees could have contributed to

discriminatory hiring, and indeed did.

### 3. Potential Conflict Between Female & Male Bridge Painters

Showing an employer's motivation to discriminate is "usually" accomplished

through the "cumulative weight of circumstantial evidence." Rosen v. Thornburgh, 928 F.2d

528, 533 (2d Cir. 1991). In determining whether Defendants were motivated by discrimination,

"[c]ourts recognize that 'direct evidence of intentional discrimination is hard to come by' and

that plaintiffs will rarely be able to produce eyewitness testimony as to the employer's mental

processes." United States v. City of New York, --- F. Supp. 2d ----, 2010 WL 234768, at *13

(E.D.N.Y. 2010) (citing Aikens, 460 U.S. at 716). "It does not follow, however, that the

plaintiffs in a Title VII case are obligated to present 'smoking-gun' proof of intentional

discrimination in order to obtain judgment." City of New York, 2010 WL 234768, at *18.

In addition to the considerable circumstantial evidence presented at trial, the Government's case is buttressed by Powell's account of the abusive and hostile environment she experienced as a female supervisor in the Bridge Painter Section. The Government showed that the Bridge Painters resisted hiring or promoting female workers to preserve a de facto boys club in which lewd sexual images and cartoons were frequently displayed and employees disparaged their female supervisor, apparently without consequences. See Washington v. Davis, 426 U.S. 229, 253 (1976) (Stevens, J., concurring) ("Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally the actor is presumed to have intended the natural consequences of his deeds."). It was apparent that assigning women to selective Bridge Painter units was an unwelcome proposition to many rank-and-file. DOT supervisors were well aware of this culture and the deplorable way Powell was treated by certain male Bridge Painters. The hostility Powell confronted as a supervisor would also have been faced by female Bridge Painters. That environment disincentivized DOT to carry out its Title VII obligations.

The Government has shown multiple related instances of discrimination. Foremost, it has proven the existence of an ongoing practice which excluded qualified women from obtaining work as Bridge Painters on the basis of their gender. The circumstantial and direct evidence adduced at trial makes out a prima facie case of discrimination. See e.g., Ortiz-del Valle, 42 F. Supp. 2d at 337-38 (finding evidence "that no women were ever hired as NBA referees," testimony regarding qualifications, and testimony that certain NBA employees "had a problem" with hiring female referees sufficient to support a jury verdict of gender discrimination). Moreover, that the discrimination appeared to impact only four women does not

-34-

diminish the Government's case—there is "[n]o precise mathematic formulation" for a pattern or practice claim. United States v. Jacksonville Terminal Co., 451 F.2d 418, 441 (5th Cir. 1971). Even discrimination against just four women is sufficient to support a pattern or practice claim. See Sorlucco v. New York City Police Dep't, 971 F.2d 864, 871-72 (2d Cir. 1992) (evidence that four probationary female police officers had been terminated was sufficient to conclude that the dismissal of one officer was part of a broader pattern or practice of discrimination by the New York City Police Department).

    c.   Legitimate Non-Discriminatory Reasons

        Where a plaintiff meets its burden in a Title VII case, "the burden [of production] then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the Government's proof is either inaccurate or insignificant." Teamsters, 431 U.S. at 360. In essence, the defendants must offer proof which demonstrates that the applicants were denied employment for lawful reasons—that is, non-discriminatory reasons. See Franks v. Bowman Transp. Co., Inc., 424 U.S. 747, 772-73 (1976); see also Aikens, 460 U.S. at 714-15. This burden on a defendant is only one of production, as opposed to persuasion. See Hicks, 509 U.S. at 509 ("In the nature of things, the determination that a defendant has met its burden of production . . . can involve no credibility assessment.").

        Although Defendants primarily argue that the Government does not make out a prima facie case, the City musters three non-discriminatory explanations for not hiring female Bridge Painters. First, the City asserts that various female applicants were not hired because they failed to satisfy certain procedural requirements—namely the Five-Year Experience and CDL Requirements or that they did not submit a resume. Second, the City asserts that budgetary

-35-

cuts prevented the hiring of Bridge Painters. Finally, Defendants aver that DOT's preparation of changing facilities for female painters shows an absence of discrimination in hiring.[4]

The City's argument that female candidates lacked qualifications or failed to submit resumes was a fact-intensive inquiry addressed earlier in this opinion and lacked any evidentiary support. Accordingly, only the budget and facilities justifications are addressed further. This Court concludes the Defendants met their burden of production on these issues and turns to the weight and credibility to be given to the Defendants' justifications. See Hicks, 509 U.S. at 509 ("For the burden-of-production determination necessarily precedes the credibility-assessment stage.").

1. Budget Cuts

Through Joseph Jarrin, the City established that there were numerous hiring freezes and headcount reductions from 1997 to 2003 that had a negative impact on DOT's ability to fill provisional Bridge Painter positions. Notably, in 1999, when Levit expected to hire seven painters, DOT was only able to hire two: Brian Casey and Frank Duic. A significant budget cut that prevents hiring constitutes a sufficient non-discriminatory defense to Title VII allegations. See Wards Cove, 490 U.S. at 648; see also Brierly v. Deer Park Union Free Sch. Dist., 359 F. Supp. 2d 275, 291 (E.D.N.Y. 2005) ("It is not a court's role to second-guess an employer's personnel decisions, so long as they are non-discriminatory.").

---

[4] Defendants also assert one individual defense against Intervenor-Plaintiff Joann Rush, arguing that her execution of a release on March 27, 2007, for claims from "an unrelated tort action against the City of New York," bars her suit. Under Title VII, the United States maintains a right of action independent of the legal rights of the individual victims of discrimination. E.E.O.C. v. Waffle House, 534 U.S. 279, 291-93 (2002); Occidental Life Ins. Co. of Cal. v. E.E.O.C., 432 U.S. 355, 370-71 (1977). Accordingly, this defense is without merit.

-36-

However, the evidence presented by the Defendants is insufficient to rebut the Government's case for two reasons. First, there was never a complete hiring freeze relieving the City of its obligation to hire qualified female Bridge Painters. Indeed, Anthony Attore was appointed in the midst of a budget reduction, revealing that appointment of any one of the four female painters was possible. As Judge Garaufis recently highlighted in the City of New York firefighter case, the defense of a "fiscal crisis" is a familiar refrain at City Hall and does little to explain why the City should be relieved of Title VII obligations. See 2010 WL 234768, at *8 (chronicling the history of Vulcan Soc. of New York City Fire Dep't Inc. v. Civil Serv. Comm'n, 490 F.2d 387 (2d Cir. 1973), in which the City avoided implementing the relief ordered "ostensibly due to a fiscal crisis"). More importantly, since this is a pattern-or-practice case, the fact that a fiscal crisis occurred in one year—2001—does not contradict proof of discrimination in prior years. Ultimately, this action concerns the hiring process, not the City's budget. And as to those procedures, Defendants cannot dispute that when both Rush and Jackson applied in 1998, DOT hired ten new male Bridge Painters instead. Further, although the City argues that Oliskovicz was going to be hired before a budget cut intervened, it offered no corroborating records to support Levit's testimony. Ultimately, budget cuts have no bearing on why less qualified males received interviews in 1998 and 1999 and were subsequently given higher interview rankings in later hiring periods.

### 2. Facilities for Female Painters

Another line of testimony developed by the City at trial concerned the construction and availability of female changing facilities. The City presented ambiguous, and at points contradictory, evidence that women's locker rooms were available. Even assuming that

-37-

locker rooms were available, that fact has no bearing on whether DOT's hiring practices violated

Title VII.  That DOT had sufficient space for women only buttresses the Government's case, as it

removes a potential business justification for hiring only men.  Regardless, the issue of locker

rooms does not go to the heart of this dispute about DOT's hiring procedures.

### d.  Totality of the Evidence

The "ultimate burden of persuading the trier of fact that the defendant

intentionally discriminated" remains at all times with the plaintiff.  Reeves v. Sanderson

Plumbing Prods., Inc., 530 U.S. 133, 144 (2000).  The Defendants proffered several non-

discriminatory justifications for failing to hire female applicants.  The burden-shifting framework

is, therefore, not at issue—rather the Court must assess the "ultimate question" of whether the

evidence shows a pattern or practice of discrimination.  See Hicks, 509 U.S. at 510-11 ("The

presumption, having fulfilled its role of forcing the defendant to come forward with some

response, simply drops out of the picture.").  The evidence leaves no room for dispute—the

Government has proven, by a preponderance of evidence, its Title VII claim.  The Government

established a prima facie case of discrimination and, for the reasons set forth above, the proffered

justifications put forth by the Defendant were either not credible or wholly inadequate to

overcome the evidence of intentional discrimination by the Defendants.  The Government

presented a compelling case detailing a multi-year pattern of discrimination at all stages in the

process of Bridge Painter hiring.  The net result was to exclude qualified and impressive women

from pursuing the careers they desired with the City of New York.  This is especially puzzling

given the City's troubles in finding enough qualified male applicants to work as Bridge Painters.

The Defendants failed to meet their legal obligations to treat men and women seeking City

-38-

employment equally, and, accordingly, this Court concludes the United States established its

pattern or practice disparate treatment claim.


II. Relief

The final issue before this Court is the appropriate relief. The Government moves

for injunctive relief pursuant to 42 U.S.C. § 2000e-5(g). That section, in relevant part, provides:

> (1) If the court finds that the respondent has intentionally engaged
> in or is intentionally engaging in an unlawful employment practice
> charged in the complaint, the court may enjoin the respondent from
> engaging in such unlawful employment practice, and order such
> affirmative action as may be appropriate, which may include, but is
> not limited to, reinstatement or hiring of employees, with or
> without back pay (payable by the employer, employment agency,
> or labor organization, as the case may be, responsible for the
> unlawful employment practice), or any other equitable relief as the
> court deems appropriate. Back pay liability shall not accrue from a
> date more than two years prior to the filing of a charge with the
> Commission.    Interim earnings or amounts earnable with
> reasonable diligence by the person or persons discriminated against
> shall operate to reduce the back pay otherwise allowable.

In Section II of its Proposed Order of Remedial Relief, the Government requests

injunctive relief with respect to DOT's procedures for hiring Bridge Painters. The United States

sets out new procedures that would govern Bridge Painter hiring, either in a provisional manner,

through a civil service exam, or should the position be reclassified as non-competitive. In

Section III, the United States requests a permanent injunction to prevent the City from violating

Title VII or retaliating against persons who cooperated with the EEOC or United States in its

pursuit of this litigation. Section IV sets out proposed relief for the Intervenor Plaintiffs,

including appointment as provisional Bridge Painters and equitable back pay. Section V lays out

monitoring and oversight requirements going forward.

"The primary purposes of Title VII are to prevent discrimination and achieve equal employment opportunity in the future, and to make whole the victims of past discrimination." United States v. City of New York, --- F. Supp. 2d ----, 2010 WL 318087, at *2 (E.D.N.Y. Jan. 21, 2010) ("City of New York II") (citing Assoc. Against Discrimination in Employment, Inc. v. City of Bridgeport, 647 F.2d 256, 278 (2d Cir. 1981)). A district court has "broad equitable discretion" to "make persons whole for injuries suffered on account of unlawful employment discrimination." Franks, 424 U.S. at 764. "Courts have generally recognized three categories of relief in Title VII cases: compliance relief, compensatory relief, and affirmative relief." City of New York II, 2010 WL 318087, at *2 (citing Berkman v. City of New York, 705 F.2d 584, 595 (2d Cir. 1983)). The United States requests both compliance and compensatory relief.

a. Compliance Relief

"Compliance relief is 'designed to erase the discriminatory effect of the challenged practice and to assure compliance with Title VII in the future.'" City of New York II, 2010 WL 318087, at *2 (citation omitted). "Such relief may include . . . ordering that new and valid selection procedures be adopted, and authorizing interim hiring that does not have a disparate impact on any group protected by Title VII." Berkman, 705 F.2d at 595. Compliance relief is "appropriate whenever a Title VII violation has been found, irrespective of any history of prior discriminatory practices or the intent of the defendant." Berkman, 705 F.2d at 595 (citing City of Bridgeport, 647 F.2d at 278).

The Government's proposal to end the standardless, ad hoc decision-making at DOT is reasonable and clearly appropriate in light of the years of discrimination. The proposed

-40-

relief—which includes wider dissemination of Bridge Painter vacancy notices and adherence to New York Civil Service Law—requires the Defendants to simply engage in behavior that should have been the modus operandi to date. Because the City has not yet decided if and when it will hire new Bridge Painters, the Government proposes procedures covering all types of hiring—provisional, from an eligible list, or as a non-competitive position. The Government's proposal does not impose a quota or set targets—indeed, it provides the City a good deal of flexibility in meeting its Title VII obligations going forward. These compliance remedies are structured to allow women to fairly compete for a position at DOT. Considering DOT's history of intentional discrimination, even such forms of relief may in some sense be termed as "affirmative," the Government is entitled to these remedies by virtue of proving a case of intentional, long-term discrimination. Berkman, 705 F.2d at 596 ("[A]ffirmative relief is normally justified only if the defendant's discrimination has been intentional."). Accordingly, this Court adopts Sections I, II, III, V, VI, and VII of the Government's Proposed Order of Remedial Relief in their entirety.

     b.  Compensatory Relief

          The United States seeks the appointment of Rush, Jackson, and Katanakis to the position of provisional Bridge Painter. Each of these women indicated at trial that she would accept the position if it was offered to her. The Government further seeks equitable compensatory relief in the form of backpay for Rush, Jackson, Oliskovicz, and Katanakis. These requests—which are designed to "make whole" the victims—are "generally appropriate under the same circumstances as compliance relief." Berkman, 705 F.2d at 595-96 (citing City of Bridgeport, 647 F.2d at 278, 282).

-41-

The Government met its burden to show a discriminatory hiring pattern and
practice by the Defendants, and, therefore, its requests for monetary and hiring relief are
appropriate. This relief is subject to the burden-shifting framework set forth in Franks. See City
of New York II, 2010 WL 318087, at *7 (citing Teamsters, 431 U.S. at 362).

Accordingly, this Court reserves final judgment with respect to the individual
hiring and compensatory relief pending further briefing from the parties setting forth the
appropriate amount of backpay and specific procedures governing provisional hiring of
discrimination victims.

## CONCLUSION

Despite their years of bridge painting experience in the private sector, female

Bridge Painter applicants were turned away by the Defendants. The City did not offer them jobs

as Bridge Painters solely because they were women. This was unvarnished sex discrimination.

The United States has proven that such discrimination was a pattern or practice of the City of

New York and the Department of Transportation in the hiring of Bridge Painters.

This Court adopts the Government's Proposed Order of Remedial Relief with

respect to Sections I, II, III, V, VI, and VII. This Court will conduct a hearing to determine

victim-specific compensation and job placement. The Government is directed to submit a

proposed judgment consistent with this Opinion and Order by May 20, 2010.

This Court will hold a conference on May 27, 2010 at 4:00 p.m. to discuss the

status of this case and to schedule appropriate additional proceedings. The Clerk of Court is

directed to terminate all motions in this case.

Dated: May 13, 2010
       New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

-43-

*Counsel of Record:*

Jeannette Anne Vargas, Esq.
United States Attorney's Office
86 Chambers Street
New York, NY 10007
*Counsel for Plaintiff United States*

Howard Wien, Esq.
61 Broadway, Suite 25
New York, NY 10006
*Counsel for Plaintiff-Intervenors*

Bruce Rosenbaum, Esq.
New York City Law Department
100 Church Street
New York, NY 10007
*Counsel for Defendants*